IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL CASE NO: 5:22-cv-491-BO-RN

CRISTOBAL LOPEZ LOPEZ and GILBERTO )
FLORES LOZANO, *on behalf of themselves and all other* )
*similarly situated persons* )
                                                          Plaintiffs )
        v. )

BOYKIN FARMS, INC., RHODES FARMING, )
LLC, WILLIE C. BOYKIN, III, MATTHEW Z. )
RHODES, TONY D. LEE, d/b/a LEE AND SONS )
FARMS, TONY CAMERON LEE, d/b/a LEE AND )
SONS FARMS, and CLINT LEE, d/b/a LEE AND SONS )
FARMS, )
                                                          Defendants. )

## Plaintiffs' Response to Lee Defendants' Statement of Material Facts

NOW COME Plaintiffs Cristobal Lopez Lopez and Gilberto Flores Lozano, and respond to Lee Defendants' Statement of Material Facts in support of their Motion for Partial Summary Judgment (DE 64) as follows:

1.     Admitted.

2.     Admitted.

3.     Disputed. When Juan Perez worked for Lee & Sons, he worked for them year-round as well, though "he kind of was off" in January. Cameron Lee Deposition ("C. Lee Depo."), DE 72-2, 35:16-21.

4.     Admitted.

5.     Disputed in part. It is undisputed that Cameron Lee handled all paperwork for Lee & Sons related to H-2A workers, and that Cameron did not keep the time for the H-2A workers,

1

but it is disputed that their supervisor Juan Perez ("Perez") kept records of all time worked. When employees performed work that was compensated by the hour, Perez recorded the hours worked each day to the nearest quarter hour, but when employees performed piecerate work, he recorded their total pieces and did not record the total time spent doing piecerate work or the start and stop time. Deposition of Juan Perez, DE 72-7, 62:18-63:9, 69:1-9, 76:10-20; 80:22-81:12

      6.      Disputed. Cameron never instructed Perez that if workers did not pick enough pieces to equal the hourly rate to pay them the hourly rate instead. With respect to how Perez kept time, Cameron testified as follows: "Juan kept the time. Q. Okay. How would he keep the time? A. I guess he wrote it down in the time book. Q. Did you ever talk to him about how to keep time? A. No. Q. Okay. Did you ever look at the – his time records? A. On occasion, I'd glance over them, . . . But as far as checking it all the time, no." C. Lee Depo. 87:3-16. He then went on to explain that when Perez started as a supervisor all Cameron told him was essentially to be fair and not "beat nobody out of time," *Id.* 88:11-17, he *guessed* that Perez was tracking their lunch break, id. 88:21-89:9, but he never trained Perez on how to keep time. *Id*. 89:14-16. Cameron testified that Perez kept track of the pieces when work was piece rate, but he really isn't sure how Perez did that, *id.* 89:17-24, and he never talked to him about "how to keep track of pieces or how to pay people for piece-rate work." *Id*. 90:20-23. Cameron testified that when workers don't "make enough production in buckets to equal the hourly rate . . . you have to pay them by the hour" and that Perez "was in charge of that." Id. 91:2-11. But when asked how he knew Perez did that he responded that he was just assuming: "Well, he would, *I'm assuming*, keep the time, you know, and look at the time versus their buckets." *Id*. 91:12-19 (emphasis added). Perez did not in fact track the hours worked by the H-2A workers when they were doing piecerate work. Juan Perez Dep. 38:25-39:2, 76:10-20, 80:22-81:17, 128:16-20; Exs. 33-36 to Juan Perez Dep. Perez also

2

testified that he did not do calculations, he just added up the totals for the hours or the pieces. Juan Perez Dep. 79:8-14.

7. Disputed. Tony Lee also determined which fields the Lee and Sons crew would work in each day, along with Cameron. Deposition of Tony Lee, DE 72-6, 54:2-22; C. Lee Dep. 37:4-12. Tony Lee and Cameron Lee determined which workers Lee and Sons would hire for their crew each season. Cameron Lee Dep. 64:10-23. Tony Lee sent the H-2A workers to work at other farms on occasion. Deposition of Gilberto Flores Lozano, DE 72-5, 30:15-16, 31:4-24; Deposition of Cristobal Lopez Lopez, DE 72-1, 37:23-38:7. Tony Lee gave Juan Perez instructions for the H-2A workers, and Juan Perez would interpret for him. Juan Perez Dep. 42:14-24, 43:11-14. Tony Lee worked with Juan to discipline or correct workers. Tony Lee Dep. 35:8-13. Tony Lee determined what time the H-2A workers needed to be in the fields. Juan Perez Dep. 53:17-20. If H-2A workers complained about their pay, Juan Perez would tell Tony Lee and he would address the problem. Juan Perez Dep. 126:12-25. Tony Lee controlled when and how much workers were paid. Tony Lee Dep. 89:3-11. Tony Lee was also involved in picking specific workers. DE 71-7 at LEE_09315, 09327.

8. Disputed. See paragraph 7 for a list of Tony Lee's responsibilities.

---

9. Admitted.

10. Admitted.

11. Admitted.

12. Admitted.

13. Admitted.

3

14. Disputed in part. Lee & Sons did not employ Juan Perez as their field supervisor and translator only because Cameron, Tony and Clint do not speak Spanish, but also because they needed someone to help supervise their employees on a daily basis including tracking their work. C. Lee Dep. 20:12-21:16, 34:21-35:6, 36:22-38:21; 87:1-19.

15. Admitted.

16. Disputed in part. Juan Perez Juan Perez did not track the hours worked by the H-2A workers when they were doing piecerate work. Juan Perez Dep. 38:25-39:2, 76:10-20, 80:22-81:17, 128:16-20; Exs. 33-36 to Juan Perez Dep.; DE 71-16, 71-18, 71-20, 71-22 (Plaintiffs' weekly payroll records).

17. Disputed. See paragraph 16. Perez only tracked time when the work was paid by the hour. He also did not track time when workers had to wait in the field after arriving before being allowed to start working. Juan Perez Dep. 54:2-15.

18. Disputed in part. Juan Perez did not track the time Plaintiff Lopez Lopez or Flores Lozano spent driving their co-workers. Juan Perez Dep., 38:25-38:2 ("Q. Did you ever record the time that people spent driving anywhere? A. No."); 128:16-20; C. Lee Dep. 133:12-136:15. Defendants did not pay Plaintiff Lopez Lopez for the time he spent driving H-2A workers to the bank and/or to the grocery store. Lopez Lopez Dep. 83:21-85:12; Flores Lozano Dep. 76:19-77:12; C. Lee Dep. 133:12-136:15; Juan Perez Dep. 38:25-39:2, 128:16-20. Defendants did not pay Plaintiff Lopez Lopez for the time he spent driving H-2A workers from the labor camp to the field, and from the field to the labor camp. Lopez Lopez Dep. 83:21-85:20; C. Lee Dep. 132:5-133:11, 136:6-15; Juan Perez Dep. 38:25-39:2.

19. Disputed in part. See response to paragraph 18. Perez turned in the payroll slips to Cameron on Thursday mornings, not Wednesday. Juan Perez Dep. 61:3-13.

4

20. Admitted.

21. Disputed in part. Lee & Sons also hired H-2A workers in 2023, although they did so through an H-2A Labor Contractor rather than hiring them directly. C. Lee. Depo. 22:24-24:9.

22. Admitted.

23. Disputed in part. Lee & Sons worked with Del-Al in 2020 and 2021 as well. Cameron Lee communicated with Del-Al staff about specific workers or types of workers (requesting Spanish speaking rather than speaking dialects) that Lee and Sons Farms was interested in hiring each year and about when they needed workers. Del-Al E-mails, DE 71-6, at D-DelAl_00014-15, 00816, 00856, 02850, 02984, 03099, 03202, 03725. Del-Al staff communicated with Matthew Rhodes, Cameron Lee, and Joyce Boykin to let them know when their H-2A workers would be getting their visas, crossing the border, and traveling to North Carolina. *Id*. at D-DelAl_00839 (April 26, 2020 email with presentation report). See also text messages between Cameron Lee and Juan Perez regarding specific workers, DE 71-7 at LEE_09315, 09327.

24. Admitted.

25. Admitted.

26. Disputed. In 2021, Lee & Sons issued payroll checks to 66 workers, not including the 29 workers that were part of the Boykin/Rhodes crew who they also paid for work. See DE 71-25, Lee & Sons Expenses by Vendor for 2021. The numbers were about the same in 2020. See Lee & Sons Expenses by Vendor for 2020, attached as Exhibit 1.

27. Admitted.

28. Admitted.

29. Admitted.

30. Disputed. Text messages between Cameron Lee and Juan Perez demonstrate that Cameron Lee was well aware of the arrangement between Juan Perez's wife and the H-2A workers to provide and sell meals and that Cameron Lee discussed the food and meals with Juan Perez. DE 80-1, at LEE_09332 ("Do you want a plate Maria and her mom cooked"), LEE-09380 ("Laura is back cooking and she called said the kitchen smells like gas but she doesn't know which stove, I told her I'd tell you"), LEE_09460 ("Maria took dinner to the guys"), LEE_09495 ("Does Laura have drinks also?"), LEE_09583 ("Thank y'all for the lunch, I'm going to pay Maria"). Tony Lee knew that his live-in friend (Tony Lee Dep. 78:12-79) or girlfriend (Deposition of Flores Lozano, DE 72-5, 73:24-74:1) was also selling meals to the H-2A workers that she prepared in the migrant housing kitchen. Tony Lee Dep. 78:12-24.

31. Disputed, see ¶ 30.

32. Disputed, see ¶ 30.

33. Disputed in part. Maria also sold meals to Cameron. See ¶ 30.

34. Admitted.

35. Disputed. By allowing Maria to use the kitchen at the migrant housing owned and controlled by them free of charge, the Lee Defendants helped Maria financially so that she could cook and sell meals.

36. Disputed. See ¶ 30.

37. Disputed. See ¶ 30.

38. Admitted.

39. Disputed. The H-2A workers believed purchasing meals was obligatory. Florez Lozano Dep. 74:2-8. The H-2A workers were required as a practical matter to purchase meals from

6

Maria and Laura because they were using the kitchens in the migrant housing to prepare meals to sell to the workers and the cooks made the kitchens off-limits to the workers. See the response to Interrogatory 9 from Mr. Rebolloza Garcia, DE 65-9, Mr. Rebolloza Gutierrez, DE 65-10, and Mr. Torres Rebolloza, DE 65-11. They were also pressured to purchase the meals offered because those people who paid for the meals were asked back while others were not. Lopez Lopez Dep. 46:19-47:16.

    40.    Admitted.

    41.    Admitted.

    42.    Admitted.

    43.    Admitted.

    44.    Admitted.

    45.    Disputed in part. It is admitted that Flores Lozano only brought incorrect information to Perez's attention on a couple of occasions, however he also testified that he was not paid for his driving time, that his hours were not tracked when he did piecerate work, and that he purchasing meals on a weekly basis was obligatory. Flores Lozano Dep. 74:2-8, 76:19-24; Florez Lozano Decl., DE 26-2, ¶ 13-17.

    46.    Admitted.

    47.    Disputed in part. It is admitted that Florez Lozano said he didn't have pay issues in 2021 during his deposition, but Defendants' records and admissions show that he did suffer pay violations including due to their failure to reimburse him in the first workweek, failure to track his hours worked when he was working by the piece, and failure to compensate him for driving time. See Plaintiffs' Statement of Undisputed Facts ¶¶ 77, 84-86, 91-93, 107, 111, 118, 125, 127, 135-137).

48. Disputed in part. It is admitted that Flores Lozano testified as stated, however he did not explain how he performed the calculations or demonstrate that he understood how to ensure that he was paid correctly based on a legal knowledge of what constitutes compensable time or based on a workweek as opposed to just a single day.

49. Admitted.

50. Disputed in part. It is admitted that Flores Lozano testified as stated, however he did not explain how he performed the calculations or demonstrate that he understood how to ensure that he was paid correctly based on a legal knowledge of what constitutes compensable time or based on a workweek as opposed to just a single day.

51. Admitted.

52. Admitted.

53. Admitted.

54. Admitted.

55. Admitted.

56. Admitted.

57. Admitted that he paid Maria, who is Juan Perez's wife, but disputed that he could have chosen not to do so. Flores Lozano Dep. 14:12-13, 19:3-25, 74:2-8, 75:2-21.

58. Admitted, but disputed that he could have chosen not to do so. Flores Lozano Dep. 16:1-17:22, 74:2-8, 75:2-21.

59. Admitted.

60. Admitted.

61. Admitted.

8

62. Admitted.

63. Disputed. See paragraph 39.

64. Admitted.

65. Admitted that Lopez Lopez's first paycheck in 2020 was dated April 29, 2020, and in 2021 it was dated April 28, 2020.

66. Admitted.

67. Admitted.

68. Admitted that Lee & Sons required Lopez Lopez to sign indicating that the hours for which he was being paid were correct in order to receive his check and that he did sign.

69. Disputed. It is admitted that Lopez Lopez testified as stated, but the records and admissions demonstrate that he had issues with his pay before 2021. See Plaintiffs' Statement of Undisputed Material Facts, DE 71, ¶¶ 77, 81-83, 106, 125-26, 128-134.

70. Admitted.

71. Disputed in part. It is admitted that Lopez Lopez did not keep his own records, but it is disputed that he can not provide capable testimony about his hours worked.

72. Admitted.

73. Admitted as to the sweet potato season in 2020.

74. Admitted.

75. Admitted that Lopez Lopez only purchased food from Maria, but disputed that he freely decided to do so. He testified that workers were pressured to purchase food from Maria because they would not be invited back again if they didn't and that with the exception of the weekends they could not use the kitchen. Lopez Lopez Dep. 46:19-47:16, 80:2-7.

76. Admitted that Lopez Lopez testified as stated, but dispute any implication that this means he could have prepared his own food instead of participating in the weekly meal plan. He and the other workers would purchase food that they could prepare without access to a kitchen to supplement the meals provided as part of the meal plan. Lopez Lopez Dep. 80:2-7.

77. Admitted.

78. Admitted.

79. Admitted.

80. Admitted.

81. Disputed in part. It is disputed that Jorge Alberto Rebolloza Garcia's "only contention" is that he was reimbursed late in 2021.

82. Admitted.

83. Admitted.

84. Admitted.

## Additional Material Facts Not in Dispute

85. Tony Lee and camp cook Laura Tobias had a relationship. Tony Lee Dep. 79:12-80:3, 81:21-25.

86. Camp cook Maria, Juan Perez's wife, met the workers at the camp after they cashed their paychecks to collect payment for the meals. Juan Perez Dep. 98:2-15.

87. The April 2020 and April 2021 Contracts promised that the H-2A workers would have access to the camp kitchens to cook their meals, and that meals would not be deducted. PLS' SMF ¶27(a) and (b).

88. Some H-2A workers purchased their own refrigerators to store food, and some purchased grills to cook their food outside. Flores Lozano Dep. 75:10-21; Juan Perez Dep. 111:22-112:14.

89. Defendants applied for and received temporary labor certification for 93 H-2A workers to work in North Carolina for Boykin Farms, Rhodes Farming, and Lee & Sons Farms as joint employers from April 25, 2020, to November 20, 2020 ("April 2020 Contract") in a variety of crops and greenhouse work and promised to pay the AEWR of $12.67 per hour. The H-2A application was signed by Willie Boykin on behalf of Boykin Farms and listed Rhodes Farming and Lee and Sons Farms as joint employers. April 2020 Contract, DE 53-1.

90. Defendants applied for and received temporary labor certification for 88 H-2A workers to work in North Carolina for Boykin Farms, Rhodes Farming, and Lee & Sons Farms as joint employers April 26, 2021 to November 27, 2021 (April 2021 Contract) in a variety of crops and to do greenhouse work and promised to pay the AEWR of $13.15 per hour. The H-2A application was signed by Willie Boykin on behalf of Boykin Farms and listed Rhodes Farming and Lee and Sons Farms as joint employers. April 2021 Contract, DE 53-2.

91. The Clearance Orders described in Paragraphs 89-90 constituted contracts between the Defendants and the H-2A workers. 20 C.F.R. § 121(q). Each of the H-2A applications submitted to USDOL by Defendants contained the following required terms which became part of those contracts:

   a. "Employer agrees to provide each worker with three meals a day or furnish free and convenient cooking and kitchen facilities to the workers that will enable the workers to prepare their own meals. Where the employer provides the meals, the job offer will state the charge, if any, to the worker for such meals. The amount of meal charges is governed by 20 CFR 655.173 20 CFR 655.122(g)."

b. "Employer agrees to keep accurate and adequate records with respect to the workers' earnings . . .The content of earnings records must meet all regulatory requirements and be retained by the employer for a period of not less than 3 years after the date of certification by the Department of Labor. 20 CFR 655.122(j)."

c. "Employer agrees to furnish to the worker on or before each payday in one or more written statement the following information: (1) the worker's total earnings for the pay period; (2) the worker's hourly rate and/or piece rate of pay; (3) the hours of employment offered to the worker . . .; (4) the hours actually worked by the worker; (5) an itemization of all deductions made from the worker's wages; (6) if piece rates are used, the units produced daily; (7) beginning and ending dates of the pay period; and (8) the employer's name, address and FEIN. 20 CFR 655.122(k)."

d. "The employer agrees that it will offer. . . and pay at least the Adverse Effect Wage Rate (AEWR), the prevailing hourly wage rate, the prevailing piece rate, the agreed-upon collective bargaining rate, or the Federal or State minimum wage rate, in effect at the time work is performed, whichever is highest. . . If the worker is paid on a piece rate basis and at the end of the pay period the piece rate does not result in average hourly piece rate earnings during the pay period at least equal to the amount the worker would have earned had the worker been paid at the appropriate hourly rate of pay, the employer agrees to supplement the worker's pay at that time so that the worker's earnings are at least as much as the workers would have earned during the pay period if the workers had instead been paid at the appropriate hourly wage rate for each hour worked. 20 CFR 655.120, 655.122(l)."

e. "Employer agrees to make all deductions from the worker's paycheck required by law. This job offer discloses all deductions not required by law which the employer will make from the worker's paycheck and all such deductions are reasonable in accordance with 20 CFR 655.122(p) and 29 CFR part 531. The wage requirements of 20 CFR 655.120 will not be met where undisclosed or unauthorized deductions, rebates, or refunds reduce the wage payment made to the employee below the minimum amounts required under 20 CFR part 655, subpart B, or where the employee fails to receive such amounts free and clear because the employee kicks back directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee. 20 CFR 655.122(p)."

f. "Employer agrees to provide a copy of the work contract to an H-2A worker no later than the time at which the worker applies for the visa. . . In the absence of a separate, written work contract entered into between the employer and the worker, the required terms of this clearance order, including all addendums, and the certified H-2A Application for Temporary Employment Certification will be the work contract. 20 CFR 655.122(q)."

*See, e.g.*, April 2020 Contract, DE 53-1, pp. 5-8; April 2021 Contract, DE 53-2, pp. 5-8.

92. Each of the H-2A applications submitted to USDOL by Defendants contained the following additional terms, filled in by the employer applicants:

a. "Employer will furnish free and convenient cooking and kitchen facilities so workers may prepare their own meals."

b. "The employer will make the following deductions from the worker's wages: FICA, Medicare and income taxes as required by law (unlike U.S. workers, foreign H-2A workers are not subject to payroll tax deductions for FICA, Medicare or federal

13

withholding.); case advances and repayment of loans, repayment of overpayment of wages to the worker; payment for articles which the worker has voluntarily purchased from the employer' long-distance telephone charges; recovery of any loss to the employer due to the worker's damage, beyond normal wear and tear, or loss of equipment or housing items where it is shown that the worker is responsible. No deduction not required by law will be made that brings the worker's hourly earnings below the higher of the federal minimum wage and State minimum wage."

c. "Employer will reimburse transportation and subsistence expenses in accordance with 20 CFR 655.122(h). Inbound transportation will be reimbursed at the end of the first workweek."

*See* April 2020 Contract, pp. 4, 13, 16; April 2021 Contract, pp. 4, 13, 16.

93. Defendants applied together for H-2A workers so that they could share workers across the farms. They did share workers each year that they submitted joint clearance orders. Cameron Lee Dep. 33:3-34:1; Deposition of Boykin Farms, DE 72-3, 42:4-20, 50:3-9; Deposition of Rhodes Farming, DE 72-4, 17:3-14, 23:7-15; Lopez Lopez Dep. 44:10-25; Text messages between Juan Perez and Cameron Lee, DE 71-7, at Lee_09342.

94. Defendant Tony Lee knew of his responsibility to reimburse the H-2A workers for the visa and travel expenses during the first workweek.

"Q. Do you understand that you're supposed to reimburse the workers for travel costs and things like that for getting to the United States?

A. We're guilty of that count – of being late. That's all – just late … When they get here – our guys, most of the time, when they got here, they went to work right then, no delay, and you give them that first week's pay. Then you add 500 to it [for the reimbursement]. Every time they're going to run and leave you hanging." Tony Lee Dep. 89:3-13, 15-20.

95. Defendant Cameron Lee knew of his responsibility to reimburse the H-2A workers for the visa and travel expenses:

"Have you ever delayed giving reimbursements to workers for any reason other than not having enough money in the bank? A. Well, to be truthful and honest, I – it would seem like an incentive for them to stay and work with you and you not pay, you know, $660, $700 for him crossing the border –"

Cameron Lee Dep. 154:2-10. *See also*, Cameron Lee Dep. 140:25-143:4, 143:16-17 ("it's a law you got to pay them back for travel"), 166:3-20.

96. Defendants did not fully reimburse the named Plaintiffs for all inbound travel expenses during their first workweek in the 2020 and 2021 agricultural seasons. Answer ¶75; Lopez Lopez Dep. 68:14-23; 2023 Lopez Lopez Decl ¶13; 2023 Flores Lozano Decl ¶13; Lee Response to 1st RFA No. 5 ("Lee and Sons did not reimburse some H-2A workers on or before the first pay date after those workers arrival in North Carolina for those full costs in 2020") and No. 6 ("Lee and Sons did not reimburse some H-2A workers on or before the first pay date after those workers' arrival in North Carolina for those full costs in 2021"), DE 71-9; Cameron Lee Dep. 89:3-7, 145:5-22, 147:24-148:10, 150:9-22, 151:25-152:7, 154:2-23, 157:19-25; Tony Lee Dep. 89:3-7 ("We're guilty of that count – of being late").

97. Defendants did not reimburse the H-2A workers who performed work for one or more of the Defendants in 2020 and/or 2021 for all inbound travel expenses during the first workweek. Lee Response to 1st RFA Nos. 5 and 6; Cameron Lee Dep. 89:3-7, 145:5-22, 147:24-148:10, 150:9-22, 151:25-152:7, 154:2-23, 157:19-25; Tony Lee Dep. 89:3-7.

98. Cameron Lee did not track the hours. of the Lee and Sons crew. Juan Perez was responsible for tracking the hours. Cameron Lee Dep. 13:10-19, 87:3, 91:12-15, 136:6-10.

99. Cameron Lee was aware that workers who were paid on a piecerate needed to earn the required hourly wage. Cameron Lee Dep. 165:9-22.

100. Defendants do not have a record of the hours worked by their H-2A workers during times when those workers were paid by the piece. Cameron Lee Dep. 110:9-111:8; Juan Perez Dep.80:22-81:3.

101. Juan Perez did not track the time Plaintiff Lopez Lopez spent driving his co-workers. Juan Perez Dep., 38:25-38:2 ("Q. Did you ever record the time that people spent driving anywhere? A. No."); 128:16-20; Cameron Lee Dep. 133:12-136:15.

102. Juan Perez did not track the time Plaintiff Flores Lozano spent driving his co-workers. Juan Perez Dep. 38:25-39:2 ("Q. Did you ever record the time that people spent driving anywhere? A. No"); 128:16-20; Cameron Lee Dep. 133:12-136:15.

103. Defendant Cameron Lee was aware of the requirement to pay drivers for the time they spent driving. Cameron Lee Dep. 132:9-133:19, 136:6-10.

104. Defendant Cameron Lee did not review Juan Perez's records to see whether the drivers were being paid for their driving time. Cameron Lee Dep. 136:6-15.

105. Defendants were involved in designating drivers and ensuring they were licensed. Juan Perez Dep., DE 72-6, 41:17-22; Cameron Lee Dep. 133:15-23. Lee and Sons' supervisor Juan Perez collected Plaintiffs' drivers' licenses and provided them to the Lees. Juan Perez Dep., 39:15-18.

106. Cameron Lee and Juan Perez decided who would drive the vehicles. Tony Lee Dep., DE 72-5, 94:9-14.

107. Lee and Sons directed the named Plaintiffs to drive. Flores Lozano Dep. 27:6-7 ("Q. Did you drive the transporter every day in 2020? A. No, just when Juan told me to"); Lopez Lopez

16

Dep. Exhibit 47, p. 174 ("Juan Perez told us we had to eat the food they provided and told me that I had to drive the bus"); Juan Perez Dep., 41:17-22; Cameron Lee Dep., 131:15-132:8.

108. After Plaintiff Lopez Lopez declined to continue to drive, he was not asked to return to work for Lee and Sons. Lopez Lopez Dep. 17:17-18:21.

109. Laura Tobias's sister, Margarita Tobias, came on an H-2A visa to work for Lee and Sons farms, but did not end up working for long. Tony Lee Dep. 79:17-80:17; Lee & Sons Expenses by Vendor for 2020, Ex. 1, at LEE_04447; Lee & Sons Expenses by Vendor for 2021, DE 71-25, p.32.

110. Laura Tobias's sister, Nora, also came to work for Lee and Sons on an H-2A visa. Tony Lee Dep. 84:25-85:23.

## Additional Material Facts Subject to Genuine Dispute

111. The kitchens at some of the Lee and Sons housing locations were locked and workers were unable to access them or not allowed to use them. Flores Lozano Dep., DE 72-5, 16:2-17:22; 20:3-21:2. Opt-In Torres Rebolloza response to Interrogatory 9, DE 61-11, pp. 9-10; Opt-In Rebolloza Garcia's response to Interrogatory 9, DE 61-12, pp. 9-10; Opt-In Rebolloza Gutierrez's response to Interrogatory 9, DE 61-13, p. 10.

112. Lee and Sons H-2A workers had to purchase their meals from either Maria or Laura and had to pay for them whether they ate them or not. Opt-In Torres Rebolloza response to Interrogatory 9, DE 61-11, pp. 9-10.

Respectfully submitted this, the 7th day of April, 2025.

NORTH CAROLINA JUSTICE CENTER
P.O. Box 28068
Raleigh, NC 27611
(919)856-2144

BY:     /s/ *Carol L. Brooke*
Carol L. Brooke
NC State Bar #29126
Email: carol@ncjustice.org
Clermont F. Ripley
N.C. State Bar # 36761
Email: clermont@ncjustice.org


HIGGINS BENJAMIN, PLLC
301 N. Elm St., Suite 800
Greensboro, NC  27401
(336) 273-1600

BY:     /s/ *Jonathan Wall*
Jonathan Wall
N.C. State Bar No. 22839
Email: jwall@greensborolaw.com

*Co-counsel for Plaintiffs*

18

CERTIFICATE OF SERVICE

        This is to certify that the undersigned has this date served the original of the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing electronically to counsel for Defendants by email to the following e-mail addresses:

Elizabeth King, eking@cshlaw.com

Marshall Wall, mwall@cshlaw.com

Kieran Shanhan, kieran@shanahanlawgroup.com

Luther D. Starling, Jr., lewstarling@dwlslaw.com

This, the 7th day of April, 2025.

                                            /s/ *Carol L. Brooke*
                                            Attorney for Plaintiffs

19

Case 5:22-cv-00491-BO-RN    Document 88    Filed 04/07/25    Page 19 of 19